UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHERRY DOWERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:11-cv-846-WTL-MJD |
| ) | |
| NOBLESVILLE SCHOOLS, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the parties' cross-motions for summary judgment. The motions are fully briefed, and the Court, being duly advised, **DENIES** the Plaintiff's motion (Docket No. 29) and **GRANTS** the Defendant's motion (Docket No. 35) for the reasons set forth below.

**I. STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required

to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II. BACKGROUND

Plaintiff Sherry Dowers began working for Defendant Noblesville Schools (the "School") in August 2006 as a custodian at the middle school. Dowers' duties as a custodian included cleaning the middle school's main gym, locker rooms, and seven or eight offices.

Custodians at each of the School's buildings work in three shifts. The first shift is from 7:00 a.m. to 3:30 p.m.; the second shift is from 3:30 p.m. to 11:30 p.m.; and the third shift is from 11:30 p.m. to 7:00 a.m. Dowers worked third shift.

The School has a policy with respect to whether and when it runs its HVAC system. Each School facility's HVAC system typically operates during first shift; however, the HVAC may also run after regular school hours under certain circumstances. For example, the HVAC will run when humidity levels inside the building are above 60%.

Prior to the summer of 2009, Dowers participated in summer "team" cleaning of School buildings. During this time, the air conditioning in the buildings was completely turned off. In 2009, Dowers decided not to participate in summer team cleaning, in part because the heat inside the buildings made it difficult for her to breathe. According to Dowers, this difficulty was related to her asthma, chronic allergies, and chronic sinusitis.

Around this time, Dowers consulted physicians regarding her difficulties breathing and working in School buildings. As a result of her consultations, Dowers and her doctors decided that air conditioning might be a solution to her problem.

In 2010, Dowers again decided not to work the summer team cleaning. During this time off, Dowers noticed she "felt a lot better" and her asthma was "better." However, when she returned to work in August 2010, her breathing complications returned. As a result, on August 12, 2010, Dowers contacted one of her physicians, Dr. Lisa Bledsoe, requesting a letter for work recommending that she "go to first shift." Dowers explained, "They turn the air off at 4:00 and I also work in the locker rooms which makes my allergies worse. My asthma gets worse and I have to use my inhalers." On August 13, 2010, Dr. Bledsoe wrote a prescription for Dowers that provided, "patient needs to move to work shift with air condition due to medical diagnosis."

Dowers presented Dr. Bledsoe's note to her supervisor, Bob Ward, that same day. Ward acknowledged the note, but he did not take any action on it. The note eventually made its way to Jeffrey Bragg, the Director of Operations for the School, who understood the note as a request for an accommodation in the form of a move to the air-conditioned first shift. Mr. Bragg asked Rod Watson, the assistant principal at the middle school, to see whether any positions were available at the school or if a change could be made. Around this time, Dowers and Bragg had a telephone conversation in which Dowers told Bragg that she needed an air-conditioned shift and Bragg agreed to assist her. Also around this time, Bragg himself began to look for positions in the district to accommodate Dowers, but he found that there were no positions available.

Dowers voluntarily resigned her employment after her conversation with Bragg. Specifically, on August 15, 2010, Dowers sent a resignation letter in which she explained,

> I found out that I have asthma do to allergies and I also have a lot of allergies, I have to get 3 shots every Monday. I had found all this out while working for the school. Well, I don't care want anyone says every time I walk into the middle school I would have problems breathing. I did work in the summers but it was very hard with no air conditioning. So I had to do something I just didn't want to do go to 9 months. Well, the 3 months I was not there I felt a lot better and my asthma was better. I thought the things would be easy this year with coming back to work but I was wrong. The first night back in the building I had an asthma attack so I went home at 5:00. The first week I have worked a little, but every time I go into the locker rooms I was getting sick. I really don't want to leave the school because I like what I do but I don't know what to do. Plus, No one cares and that is really hard to take. I love working for the school and I love the work I do, but my health can't take a backseat to this job. I talk to Mr. Watson he said he would look into it and I get a phone call telling me [t]hat there is nothing they can do and he told me that he had talked to Mr. Rich and Mr. Braggs. So this is forcing me to leave, Thank you for the opportunity to be employed with Noblesville School Systems I wished things could have been different.

After her resignation, Bragg contacted Dowers and asked her to rescind her resignation. He explained that he "didn't realize how [Ward and Watson] were handling [the issue] until he received her resignation." He called her and explained that he did not want her to resign and he stated that there were "other options out there." Bragg proposed to have Dowers work the second shift on the School's freshman campus, even though he acknowledged that it wasn't "what [Dowers] was asking for." Dowers remembers Bragg telling her during this conversation that there weren't any first shift positions open, but he suggested she go over to the freshman campus and "try it and see if it worked." Bragg further explained that he would notify Dowers in the event an air-conditioned shift became available.

Bragg later explained why he suggested this move:

> So as I called her about this position, I told her, I can't bump somebody and remove them from their position, but I'd like to try something else. If you read her resignation letter, it came out as more that there's some other issues at the middle school that, through my communications with the people at the building level, that she wasn't very happy with the building supervisor she was working around. She didn't like the atmosphere. My hope was to get her out of that atmosphere, immediately try something else with the one piece that we had open at the time.

> . . . .
>
> [A]s her and I talked on the phone, it wasn't what she was asking for, but it was a change. And so from the people who – that supervised her, that she had been around, and from her resignation letter, again, it was a chance. My hope was to help create something for her that was at least a change and a start that might be little different.
>
> We deal with air quality all the time, and so it's very possible that a facility someone is working in might also cause problems or elevate asthma or allergies in an individual. So the change in the atmosphere in the facility, and even from her resignation letter, the fact that she didn't – didn't feel wanted or needed at the middle school, in my mind was more of a physical and mental help on the chance side. And that's why at least that was offered in that second shift position.
>
> . . . .
>
> My thought was the cooler months were four to six weeks away, and my hope that was if we could change facilities, that would help get her to the cooler months. And typically we have – I won't say quite a bit of turnover, but we have enough turnover in custodial positions that things open up.

Bragg Dep. 30:21-32:25; 40:15-21. However, Bragg did not seek information as to the severity of Dowers' disability and he did not consider positions other than custodial positions. He also did not inquire as to whether any other custodian desired or was willing to consider a shift change.

Ultimately, Dowers accepted Bragg's offer to work at the freshman campus, and she reported for work on Friday, August 20, 2010. However, during this shift she experienced an asthma attack and could not continue working, so she left the freshman campus. That evening, Dowers sent Bragg an email: "I did give Sherrie the keys and told Cindy I was going home. Its [sic] not going to work I have to have air conditioning. Well can you call me on Monday Thank You for all Your help."

Sometime during the following week, Bragg contacted Dowers. Bragg described the content of their conversation: "I recall the content of that conversation just being that this isn't going to work. I need an air conditioned position. I appreciate your help. Thank you for trying,

5

but this isn't going to work. And I took that as her resignation and understood that's – of our conversation, how it went, that she was resigning her position." Bragg explained that

> [i]t was my impression she was resigning because she had already resigned once, and I talked her off the ledge. And then she tried the accommodation that I tried first with her, and she seemed frustrated but very thankful for trying to help her. And at that point was – just seemed like she was spent and done with dealing with it and resigning. So at that point, I didn't question her again to ask her if she could try something else, because I understood she was resigning.

Bragg Dep. 38:18-39:2. However, at the time Bragg did not provide her any instructions on what she should do to complete her resignation. According to Bragg, he did not ask Dowers if she would try something else because he understood her to be resigning. He testified that if she had said anything during their conversation to the effect that she wanted to try something else, Bragg would have tried to work with her.

Following her shift at the freshman campus, Dowers believed that she was still employed; she did not think she had resigned her position. However, on August 26, 2012, Dowers returned her uniform shirts, remaining keys, and ID badge to the School. Dowers' next contact from the School was a letter from Liz Roberts, the human resources coordinator for the School, dated August 27, 2012. The letter instructed her that she must either tender her resignation or be involuntarily terminated without eligibility to be rehired. Ultimately, the School deemed Dowers' original resignation letter sufficient and recorded her as having resigned as of August 14, 2010. Dowers' resignation was accepted by the School Board at its regular meeting on September 20, 2010.

### III. DISCUSSION

The Americans with Disabilities Act (the "ADA") prohibits an employer from discriminating against an employee on the basis of disability with respect to the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). Discrimination under the ADA

includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). To this end, the ADA contemplates that "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] . . . . This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Like any form of communication, the success of this process depends on the parties' abilities to clearly convey their messages. This case demonstrates how quickly the process can break down when the parties fail and it analyzes the ever-important question: who is to blame for the breakdown? Here, Dowers and the School each move for summary judgment, asserting that the other party is responsible for the breakdown in the interactive process as a matter of law.[1]

As an initial matter, "[f]ailure to engage in this 'interactive process' cannot give rise to a claim for relief . . . if the employer can show that no reasonable accommodation was possible." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). A reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). However, "[i]t is the employer's prerogative to choose a reasonable

---

[1] An employee alleging an employer's failure to accommodate under the ADA must show that (1) she is a qualified individual; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate her disability. *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747-48 (7th Cir. 2011). For the purposes of summary judgment, the School does not dispute the first two elements.

accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Sears*, 417 F.3d at 802 (citing *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000)). "Still, at the very least, the employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations." *Sears*, 417 F.3d at 802. At the same time, "[r]easonableness does not depend solely on effectiveness or timeliness; in some circumstances, an accommodation can be reasonable even if it does not work as well as expected or if it takes a while to take effect. But reasonableness does depend on a good-faith effort to assess the employee's needs and to respond to them." *Feliberty v. Kemper Corp.,* 98 F.3d 274, 280 (7th Cir. 1996).

With respect to this point, Dowers argues that at least two reasonable accommodations existed: transferring Dowers to the air-conditioned first shift or running the air conditioning in her work area during her shift. The parties argue at length about the reasonableness of the first proposed accommodation, but the School does not address whether the second proposed accommodation was reasonable. Thus, for purposes of this motion, the Court will assume that the second accommodation is reasonable. The Court thus turns to the interactive process itself.

> In analyzing the breakdown in the interactive process, courts should be mindful that
>
> [n]o hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. . . . The determination must be made in light of the circumstances surrounding a given case.

*Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir. 1996). With respect to the parties' participation in the interactive process, Dowers directs the Court's attention to the

events of August 2010, as "[t]he issue of Ms. Dowers' disability and the School's response thereto did not truly come to a head until [then]." Dowers argues that the School is responsible for the breakdown because it engaged in the process in bad faith. Specifically, its bad faith during the process is demonstrated in two ways: (1) its failure to investigate Dowers' disability; and (2) its abrupt conclusion of the interactive process. The Court addresses each argument in turn below.

Dowers argues that the School exhibited bad faith because Bragg "never made an inquiry as to the nature and severity of Ms. Dowers' physical limitations" nor did he "investigate the availability of other accommodations"; rather, Bragg "attempted to shove a square peg through a round hole without engaging in the interactive process contemplated by the ADA." According to Dowers, "[a]n employer cannot be said to have participated in the interactive process in good faith when his sole attempt at providing a reasonable accommodation for an employee's disability was not based on discussion and understanding of her physical needs." The Court does not agree. "As the interpretative guidelines and courts have recognized, there may be some situations in which the reasonable accommodation is so obvious that a solution may be developed without either party consciously participating in an interactive process." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999); *see also Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2005) ("The less that is available in the employer's enterprise in the way of reasonable accommodations to the employee's particular disability, the less there is to consult about with a disabled employee seeking an alternative or reconfigured job with the employer."). In other words, formal inquiries are not the indispensable hallmark of good faith. Furthermore, the process is not so rigid as to require an intense, wide-blown investigation at the first request, especially when the request is unambiguous. *Cf. Bultemeyer v. Fort Wayne Cmty. Schs.*, 100

9

F.3d 1281, 1285 (7th Cir. 1996) ("If the note was too ambiguous and FWCS did not know what Bultemeyer wanted, FWCS easily could have called Dr. Fawver for a clarification."). Rather, employers are entitled to take reasonable preliminary steps as they work through the interactive process. *See Loulseged*, 178 F.3d at 737 ("[W]e believe that in an informal process the employer is entitled to move at whatever pace he chooses as long as the ultimate problem – the employee's performance of her duties – is not truly imminent. . . . In an informal process, [the employer's] actions would seem to be quite reasonable *preliminary* steps to take."(emphasis in original)). Of course, there may come a point in the process when an employer's repeated attempts at accommodation evince such a failure to understand the employee's disabilities that the employer has indeed exhibited bad faith by not asking for clarification, but that is not this case, for here the process ended prematurely. Simply put, Bragg's undisputed failure to investigate the severity of Dowers' disability, as well as alternative job duties, does not establish the School's bad faith as a matter of law because the process ended so quickly and abruptly.

> The Court turns next to assigning responsibility for that premature ending:

> When a breakdown occurs because an employer creates an objectively reasonable perception that the process is clearly at an end, the employer is as well placed as the employee to avoid the situation. It knows what it said, and how a reasonable person would interpret it, and thus bears responsibility for salvaging the process. But when an employer's statements do not rise to that level, and the breakdown is caused by the subjective spin the employee chooses to place on them, only the employee can prevent the process from collapsing. The employer can hardly be expected to know that the employee is laboring under an unreasonable conviction that further discussion would clearly be futile.

*Loulseged*, 178 F.3d at 739. Reading the evidence in the light most favorable to Dowers, a reasonable jury could find that Watson created the objectively reasonable perception that the process was clearly at an end when he told her that there was nothing he could do. If the facts ended there, the School would be responsible for the breakdown. But, as it happens, the School

attempted to salvage the process: when Bragg received Dowers' resignation, he contacted her and asked her to reconsider. Bragg proposed to have Dowers work the second shift on the School's freshman campus, even though he acknowledged that it wasn't what she had requested, and Dowers agreed to try the new position, but this attempted accommodation failed. At some point the following week, Dowers and Bragg discussed what had happened, and it is during this conversation that the breakdown of the process occurred. According to Bragg, Dowers resigned; according to Dowers, she awaited Bragg's recommendation of an alternative accommodation.

Dowers argues that the conversation between Bragg and Dowers is subject to two possible interpretations: "that the particular accommodation attempted was not going to work, as is clear from the fact that Ms. Dowers suffered an asthma attack while attempting it, or that the continuing employment was not going to work." Under the first interpretation, Bragg's subsequent failure to respond with an offer of another accommodation would constitute the end of the interactive process, and the responsibility for its end would fall on the School. Under the second interpretation, Dowers' effective resignation would constitute the end of the interactive process, and the responsibility for its end would fall on Dowers. As Bragg testified that he understood that Dowers was resigning, in order to survive summary judgment Dowers must then produce sufficient evidence from which a jury could conclude that Bragg's interpretation of the telephone call with Dowers was unreasonable. It is only if Bragg's interpretation were unreasonable that his subsequent failure to respond could be evidence of bad faith, thereby subjecting the School to liability for the breakdown in the process.

In support of her position that Bragg's interpretation was unreasonable, Dowers points to her August 15, 2010, resignation letter, in which she writes, "I really don't want to leave the school because I like what I do but I don't know what to do. . . . I love working for the school

11

and I love the work I do, but my health can't take a backseat to this job. . . . So this is forcing me to leave, thank you for the opportunity to be employed with Noblesville School Systems I wished things could have been different." According to Dowers, her expressions of love for her job render Bragg's interpretation that she was resigning unreasonable. Yet, even when read in the light most favorable to Dowers, the context of her statements indicates that, despite her love of her job, she was willing to resign it. As a result, this evidence alone[2] is an insufficient basis for a jury to conclude that Bragg's interpretation was unreasonable. Because Dowers cannot show that Bragg's interpretation of Dowers' statements during their conversation was unreasonable, Dowers cannot show that the School engaged in the process in bad faith, and she therefore cannot show that the School is responsible for the breakdown of the interactive process. Accordingly, the School is entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Sherry Dowers' motion for summary judgment is DENIED. Defendant Noblesville Schools' motion for summary judgment is **GRANTED**.

SO ORDERED:   10/09/2012

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[2] This evidence is indeed all Dowers has. During her deposition, Dowers testified that she could not even remember having had a conversation with Bragg, let alone the content of that conversation. She does not, however, dispute Bragg's testimony that the conversation occurred, nor does she contest his testimony as to its content; she disputes only the inference Bragg drew.